# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

JENNIFER RENEE VALLEE                     Case No. 1:19-cv-114
      Plaintiff,                              Cole, J.
                                     Litkovitz, M.J.

      vs.


COMMISSIONER OF                           **REPORT AND**
SOCIAL SECURITY,                          **RECOMMENDATION**
      Defendant.


      Plaintiff Jennifer Renee Vallee brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the final decision of the Commissioner of Social Security (Commissioner) finding that her disability ceased on January 29, 2015, and she is no longer qualified for Supplemental Security Income (SSI) benefits.   This matter is before the Court on plaintiff's Statement of Errors (Doc. 10), the Commissioner's response in opposition (Doc. 17), and plaintiff's reply memorandum (Doc. 18).

## I.  Procedural Background

      Plaintiff filed applications for benefits in July 2008 and January 2009 alleging disability due to complex regional pain syndrome and a history of polysubstance abuse.   Plaintiff's applications were granted with an onset date of March 5, 2008.   (Tr. 85-95).   The Commissioner conducted a continuing disability review and determined that plaintiff's disability ceased on January 29, 2015.   This determination was upheld upon reconsideration by a state agency Disability Hearing Officer.   (Tr. 177-81).   Plaintiff, through counsel, requested and was granted a de novo hearing before an administrative law judge (ALJ).   On December 5, 2017, ALJ Kristen King held a hearing at which plaintiff and a vocational expert (VE) appeared and testified.   On April 4, 2018, the ALJ issued a decision finding that plaintiff's disability ended as

of January 29, 2015, and she had not become disabled again since that date. (Tr. 15-31). Plaintiff's request for review by the Appeals Council was denied, making the decision of the ALJ the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Comparison Point Determinations

To qualify for SSI, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 1382c(a)(3)(A). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 1382c(a)(3)(B).

Once an individual has been found disabled, continued entitlement to those benefits depends on whether "there has been any medical improvement in [the individual's] impairment(s) and, if so, whether this medical improvement is related to [the individual's] ability to work." 20 C.F.R. § 416.994(b). There must be "substantial evidence" of "medical improvement" and proof that the claimant is "now able to engage in substantial gainful activity" to satisfy the medical improvement standard. 42 U.S.C. § 423(f)(1). *See also Niemasz v. Barnhart*, 155 F. App'x 836, 840 (6th Cir. 2005).

Medical improvement is defined as "any decrease in the medical severity of [the individual's] impairment(s) which was present at the time of the most recent favorable medical decision that [the individual was] disabled or continued to be disabled." *Kennedy v. Astrue*, 247 F. App'x 761, 764-65 (6th Cir. 2007) (citing 20 C.F.R. § 404.1594(b)(1)). Any findings of "a

2

decrease in medical severity must be based on changes (improvement) in the symptoms, signs or laboratory findings associated with [the individual's] impairment(s). . . ."  20 C.F.R. § 416.994(b)(1)(i).   If there has been a decrease in the severity of the impairments since the favorable decision, the medical improvement is related to the individual's ability to work only if there has been a corresponding "increase in [the claimant's] functional capacity to do basic work activities. . . ."  *Kennedy*, 247 F. App'x at 765 (quoting 20 C.F.R. § 404.1594(b)(3)).  *See also Nierzwick v. Comm'r of Soc. Sec.*, 7 F. App'x 358, 361 (6th Cir. 2001).   Medical improvement is "is determined by a comparison of prior and current medical evidence which must show that there have been changes (improvement) in the symptoms, signs or laboratory findings associated with that impairment(s)."  20 C.F.R. § 416.994(b)(2)(i).

If there is a finding of medical improvement, the ALJ must determine whether the individual has the ability to engage in substantial gainful activity.  *Kennedy*, 247 F. App'x at 765.  The implementing regulations for this part of the evaluation incorporate many of the standards set forth in the regulations that govern initial disability determinations.  *Id.* (citing 20 C.F.R. § 404.1594(b)(5) and (f)(7)).   The difference is that "the ultimate burden of proof lies with the Commissioner in termination proceedings."  *Id.* (citing 20 C.F.R. § 404.1594(b)(5) and (f)(7); *Griego v. Sullivan*, 940 F.2d 942, 944 (5th Cir. 1991)).   An increase in the claimant's functional capacity will lead to a cessation of benefits only if, as a result, the claimant can perform her past work or other work.  20 C.F.R. § 416.994(b)(5).

Regulations promulgated by the Commissioner establish a seven-step sequential evaluation process in determining whether an SSI recipient's entitlement to disability benefits has ended:

(1) Is there an impairment or combination of impairments that meets or equals a listed impairment from the Listing of Impairments of Appendix 1 of subpart P? (If yes, disability continues.)

(2) If no impairment meets or equals a listed impairment, has there been medical improvement as defined in § 415.994(b)(1)(i)?  (If yes, apply step 3.  If no, disability continues, subject to the exceptions in step 4.)

(3) If there has been medical improvement, is the medical improvement related to the ability to work, i.e., has there been an increase in the individual's residual functional capacity?  (If no, apply step 4.   If yes, apply step 5.)

(4) Do any of the exceptions from § 416.994(b)(3) and (4) apply? (This step contains the exceptions to continuing disability even when no medical improvement is found at step 2 or the improvement is not related to ability to do work at step 3.)

(5) If none of the exceptions apply, do the combined effect of the individual's impairments on the residual functional capacity significantly limit the ability to perform basic work activities?  (If yes, continue to step 6.  If no, disability ceases.)

(6) Can the individual perform past relevant work?  (If yes, disability ceases.  If no, apply step 7.)

(7) Can the individual perform other work?  (If yes, disability ceases.  If no, disability continues.)

*See* 20 C.F.R. § 416.994(b)(5).

**B.    The Administrative Law Judge's Findings**

The ALJ applied the sequential evaluation process and made the following findings of

fact and conclusions of law:

1. The most recent favorable medical decision finding that the [plaintiff] was disabled is the determination dated November 16, 2012.  This is known as the "comparison point decision" or CPD.

2. At the time of the CPD, the [plaintiff] had the following medically determinable impairments: a complex regional pain syndrome and a history of polysubstance abuse.  These impairments were found to result in the residual functional capacity for a less than full range of sedentary work (citation to record omitted).

4

3. The medical evidence establishes that, as of January 29, 2015, the [plaintiff] had the following severe combination of medically determinable impairments best described as: a history of a complex regional pain syndrome with ongoing generalized pain, a history of polysubstance abuse, degenerative changes with chronic polyarthralgias, depression, anxiety, and post-traumatic stress disorder (PTSD). These are the [plaintiff]'s current impairments.

4. Since January 29, 2015, the [plaintiff] has not had an impairment or combination of impairments which meets or medically equals the severity of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.925 and 416.926).

5. Medical improvement occurred as of January 29, 2015 (20 CFR 416.994(b)(1)(i)).

6. The [plaintiff]'s medical improvement is related to the ability to work because it has resulted in an increase in the [plaintiff]'s residual functional capacity (20 CFR 416.994(b)(2)(iv)(B)).

7. Beginning on January 29, 2015, the [plaintiff] has continued to have a severe impairment or combination of impairments (20 CFR 416.994(b)(5)(v)).

8. Beginning on January 29, 2015, the [plaintiff] has had the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except she should never operate foot controls with the right lower extremity. She can only occasionally operate foot controls with the left lower extremity. She should never climb ladders, ropes, or scaffolds. She can only occasionally climb ramps and stairs, and can only occasionally balance, stoop, kneel, crouch, and crawl. She should avoid all exposure to extreme cold and avoid all exposure to extreme heat. She should avoid all use of dangerous machinery and avoid all exposure to unprotected heights. She is limited to no commercial driving. She is limited to simple, routine tasks. She is limited to jobs in which changes occur no more than approximately 10% of the workday. She can interact with the public no more than approximately 10% of the workday, but no transactional interactions, such as sales or negotiations. She can have only occasional interaction with coworkers and supervisors.

9. Beginning on January 29, 2015, the [plaintiff] has been unable to perform past relevant work (20 CFR 416.965).[1]

10. On January 29, 2015, the [plaintiff] was a younger individual age 18-49 (20 CFR 416.963).

---

[1] Plaintiff's past relevant work was as a sandwich maker and cashier, both medium, unskilled positions. (Tr. 29, 76).

11. The [plaintiff] has at least a high school education and is able to communicate in English (20 CFR 416.964).

12. Transferability of job skills is not an issue in this case because the [plaintiff]'s past relevant work is unskilled (20 CFR 416.968).

13. Beginning on January 29, 2015, considering the [plaintiff]'s age, education, work experience, and residual functional capacity based on the current impairments, the [plaintiff] has been able to perform a significant number of jobs in the national economy (20 CFR 416.960(c) and 416.966).[2]

14. The [plaintiff]'s disability ended on January 29, 2015, and the [plaintiff] has not become disabled again since that date (20 CFR 416.994(b)(5)(vii)).

(Tr. 16-31).

## C.  Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole.  *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

---

[2] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform 250,800 unskilled, light and sedentary jobs in the regional economy, citing representative jobs such as laundry article sorter, machine feeder, table worker, eyeglass frame polisher, and laminator 1.  (Tr. 30, 79).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)). *See also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 545-46 (6th Cir. 2004) (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Medical Evidence and Opinions

#### 1. *Continuing Disability Review Investigation*

The Commissioner conducted a continuing disability review of plaintiff's disability determination from September to November 2014. (Tr. 96-105, 442-67). An allegation of fraud had been made. (Tr. 444). It was noted that plaintiff had a normal gait and station each time she was examined in 2013. (Tr. 96). She was not taking medications for complex regional pain syndrome. (*Id.*). When the Cleveland Cooperative Disability Investigations Unit investigators met plaintiff at her home on November 7, 2014, she attempted to drag her large dog to another section of the home and appeared to have no discomfort as she applied direct force to her right and left legs while trying to pull the dog. She placed full weight on one leg while leaning towards the weight-bearing leg and straightening her opposite leg, with an inward lean at the ankle. (Tr. 97, 448). Plaintiff was studying online with Everest College. At that time, she was in the third year of a Bachelor of Science degree. (Tr. 448). She had obtained an associate degree in paralegal studies in 2013. (Tr. 451).

7

The state agency Disability Hearing Officer concluded that disability ceased in January 2015.  (Tr. 98).

    2.    *Jane Newman, M.A.*

Plaintiff treated with Ms. Newman for counseling from April 2013 through April 2014. In April 2014, Ms. Newman completed a mental status questionnaire in which she reported that plaintiff presented as well-groomed with pressured speech and anxious presentation.   She exhibited frequent irritability, depressive episodes, and psychomotor agitation.   Her symptoms included muscle tension, worry, feeling on edge, shaking hands, and isolation.   She was oriented to time, place, person, and situation.   Ms. Newman reported that plaintiff possessed above average intelligence; her concentration was poor when she was highly anxious (which occurred intermittently); her memory and reasoning were within normal limits, except in interpersonal relationships; her insight was fair; and her judgment was inconsistent.   (Tr. 388). Ms. Newman diagnosed major depression, unspecified anxiety disorder, and PTSD.   Ms. Newman concluded that plaintiff's ability to follow directions and maintain attention was within normal limits; she became highly stressed in social situations; and she was able to tolerate simple, routine, repetitive tasks if she was not standing.   (Tr. 389).

    3.    *Clinton Memorial Hospital*

Plaintiff presented to the emergency department on February 17, 2015, complaining of nausea, emesis, and tremors for the last 12 to 16 hours.   The emergency department physician noted that plaintiff was a long time alcohol drinker and had delirium tremens previously when she stopped drinking.   She stopped drinking in preparation for her upcoming cataract surgery. She also had hypertension and had not taken her blood pressure medication for the last week or

two.  (Tr. 893).  Her examination was within normal limits with the exception of bilateral upper extremity tremors.  (Tr. 894).

Plaintiff was seen at the Family Health Center on February 23, 2015 for her pre-op visit for cataract surgery.  It was noted she also had a cardio appointment coming up the following month due to palpations.  She was ambulating with a cane due to foot pain.  On examination, she exhibited a regular heart rate and rhythm; her lungs were clear; and her musculoskeletal exam was normal.  (Tr. 767).

Plaintiff underwent cataract surgery on both eyes with Dr. Joseph Chen in February 2015. (Tr. 773-76).  When seen for a follow-up appointment in March, Dr. Chen reported that plaintiff's vision was 20/20 in both eyes.  (Tr. 1159).  On April 6, 2015, Dr. Chen reported that plaintiff's visual fields were normal and she "should have no difficulty performing daily task or work-related activities due to her visual."  (Tr. 800).

On March 31, 2015, plaintiff underwent a Transthoracic Echocardiogram which was found to be normal with an ejection fraction of 55-60%.  (Tr. 761-64).

Plaintiff presented to the emergency department in May 2015 due to alcohol withdrawal complaints and "acute change in mental status."  (Tr. 958).  She reported that she had not used any alcohol in over 48 hours.  (Tr. 958).  On examination, her behavior/mood was cooperative and aggressive.  Her affect was animated, and she was oriented to person and place.  She had no thoughts or intent to harm herself or others.  Her judgment and insight were impaired. Plaintiff's memory was normal, and she did not exhibit delusions or hallucinations.  It was noted that plaintiff was "clearly under the influence."  (Tr. 959).  Plaintiff exhibited a normal gait on physical examination.  She pulled out her own IV and left the emergency room.  (Tr. 959).

9

Plaintiff was seen in the emergency department again in July 2015 for alcohol related issues.   On physical examination, plaintiff's sensation was intact; she moved all extremities; her cranial nerves were intact; and she had a full range of motion.   (Tr. 972-73).   At an emergency department visit on August 1, 2015, she complained of alcohol withdrawal and "the shakes." (Tr. 981).   Her motor exam was normal, and her gait was steady and at a normal pace with no difficulty.   (Tr. 982).

Plaintiff was admitted at the hospital while intoxicated on August 22, 2015.   Her condition improved, and she had a normal mood and affect upon discharge.   (Tr. 1008-17).

4.     *HealthSource of Ohio*

Plaintiff established care with Rachel Sneed, M.D., at HealthSource of Ohio in March 2015.   Plaintiff reported panic attacks.   She had quit drinking and gone through detox, and she had experienced 23 days of sobriety.   She also reported a history of complex regional pain syndrome with a current flare in her foot.   She had a cane with her at the appointment "just in case."   At that time, she was seizure free and her examination was normal.   (Tr. 814-17).

Plaintiff was seen in April 2015 with complaints of joint pain, which she reported was worse first thing in the morning.   Plaintiff also complained of swelling in her fingers.   (Tr. 806).   On examination, she has tenderness to all finger joints with mild synovitis.   Her pain was not relieved with NSAIDS.   (Tr. 808).

Plaintiff was seen in June, August, and October 2015 for a sore throat, cold symptoms, and sinus pain and pressure.   (Tr. 1054, 1058, 1063).   In March 2016, plaintiff was seen for chronic right foot pain.   She stated she had experienced a flare one week ago with pain, cramping, and swelling.   (Tr. 1042).   She had a normal physical examination.   (Tr. 1044). She was given a referral to restart physical therapy.   (*Id*.).

10

Plaintiff was seen in July 2017 to discuss her medication for depression and anxiety. Plaintiff was previously prescribed a low dose of Risperdal, and she stated that she felt more stable.   (Tr. 1644).   On mental status examination, Dr. Sneed noted plaintiff was oriented to time, place, person, and situation.   Her mood and affect were appropriate.   She exhibited normal insight and judgment and no pressured speech or suicidal ideation.   Dr. Sneed noted plaintiff was doing much better since adding Risperdal but was not to goal.   Plaintiff's Risperdal dosage was increased.   (Tr. 1647).

In October 2017, plaintiff exhibited an appropriate mood and affect, normal insight, and normal judgment.   Dr. Sneed noted that plaintiff was to take extra Vistaril during her panic attacks.   Dr. Sneed also noted that plaintiff was being seen at Solutions Community Counseling and Recovery Centers to determine her treatment plan.   (Tr. 1634).

5.       *Solutions Community Counseling and Recovery Centers*

Plaintiff underwent an initial psychiatric evaluation at Solutions Community Counseling and Recovery Centers on June 4, 2015.   She reported a history of various sexual assaults.   She spent the last year trying to get sober, stop partying, and finish school.   (Tr. 1185).   On mental status examination, plaintiff was well-groomed; mildly agitated and impulsive; moderately demanding; and mildly grandiose and persecutory.   (Tr. 1186).   Her eye contact was average; her speech was moderately rapid and mildly pressured; her mood was moderately depressed and anxious; she was moderately hyperactive and restless; and her affect was severely labile.   (*Id.*). Her intelligence was found to be average.   (*Id.*).   Plaintiff was diagnosed with PTSD; alcohol Dependence NOS; and Cocaine Dependence in Remission.   (Tr. 1187).   Plaintiff's medications were adjusted.   (Tr. 1188).

11

Plaintiff received treatment on a monthly to bi-monthly basis for anxiety and alcohol abuse from August 2015 through March 2016.   (Tr. 1193-1275).   By April 2016, plaintiff reported that she was tolerating Effexor with no difficulty and had no problems with side effects. She reported that her mood was improving and her energy and motivation were usually good. She also reported that her anxiety had been improving somewhat and she rarely took Vistaril. Plaintiff stated that Buspar had been effective for her symptoms; she was maintaining her sobriety; and she was attending AA.   (Tr. 1191-92).

6.     *Consultative examining psychologist, Taylor Groneck, Ph.D.*

On January 17, 2015, consultative psychologist Dr. Groneck evaluated plaintiff for disability purposes.   (Tr. 469-74).   At the time of the evaluation, plaintiff was enrolled in an online university, but she was taking a break for a quarter due to anticipated cataract surgery on both eyes.   She reported her grades as straight A's.   Plaintiff reported that she was generally a pleasant person.   Plaintiff also reported that she mistrusted others and experienced panic attacks from being stalked by an ex-boyfriend.   (Tr. 471).   On mental status examination, plaintiff's speech was within normal limits; her thoughts were circumstantial; and she exhibited a normal mood and appropriate affect.   Dr. Groneck observed that plaintiff trembled when discussing previous traumatic events.   Plaintiff was alert and oriented and recalled 7 digits forward and 5 in reverse.   Dr. Groneck commented that plaintiff did not appear to minimize or exaggerate reported difficulties and appeared to be open, honest, and forthcoming.   (Tr. 473).   Dr. Groneck diagnosed plaintiff with chronic Posttraumatic Stress Disorder and Panic Disorder without a history of Agoraphobia.   (*Id.*).

Dr. Groneck opined that plaintiff would likely have problems concentrating when she experienced a panic attack.   Dr. Groneck also opined that plaintiff may require breaks to manage

12

her symptoms; may have some difficulty adjusting to major and unexpected changes; was capable of adjusting to most minor changes in a work routine; and may appear vigilant around male coworkers.   (Tr. 474).

       7.    *State Agency Review*

State agency physician Elaine Lewis, M.D., reviewed plaintiff's file in July 2015 upon reconsideration to assess plaintiff's physical limitations.   Dr. Lewis found that plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for about 6 hours in an 8-hour workday; and sit for about 6 hours in an 8-hour workday.   (Tr. 858).   Dr. Lewis also determined that plaintiff was limited to occasionally climbing ramps, stairs, ladders, ropes, and scaffolds; was limited to occasionally crouching and crawling; and should avoid even moderate exposure to unprotected heights, hazards, and commercial driving.   (Tr. 859, 861).   Dr. Lewis found plaintiff partially credible, noting that plaintiff was found guilty of fraud/similar fault in the January 2015 continuing disability review investigation.   Dr. Lewis reported that plaintiff did not have a severe vision impairment, and she showed no signs of end organ damage due to hypertension.   (Tr. 862).

On January 28, 2015, state agency psychiatrist Dr. Ermias Seleshi, M.D., reviewed plaintiff's file to assess plaintiff's mental limitations.   (Tr. 485-98).   Dr. Seleshi concluded that plaintiff had no restrictions in activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and experienced no episodes of decompensation of extended duration.   (Tr. 495).   Dr. Seleshi gave "great weight" to Dr. Groneck's opinion.   (Tr. 497).

State agency psychologist Karla Voyten, Ph.D., reviewed plaintiff's file on July 17, 2015 upon reconsideration.   Dr. Voyten concluded that plaintiff had mild restrictions of activities of

daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and experienced no episodes of decompensation of extended duration.  (Tr. 877).  Dr. Voyten gave "great weight" to Dr. Groneck's opinion, stating it was consistent with the objective evidence.  (Tr. 883).  Dr. Voyten found that plaintiff was capable of performing simple, routine tasks in a predictable setting where changes are infrequent and easily explained and was capable of superficial workplace social interactions. (Tr. 884).  Dr. Voyten found plaintiff partially credible, noting inconsistencies with plaintiff's reports about the extent of her drug and alcohol use.  (*Id.*).

E.    **Specific Errors**

On appeal, plaintiff alleges the ALJ erred: (1) by improperly relying on the detectives' observations reflected in the Cleveland Cooperative Disability Investigations Unit report; (2) in weighing the assessments of state agency reviewing psychologist Dr. Voyten and failing to address or discuss the Psychiatric Review Technique form completed by Dr. Seleshi; (3) by affording "some weight" to the opinion of Dr. Groneck; (4) by relying on Dr. Voyten's limitations set forth in the Psychiatric Review Technique and mental RFC forms; (5) by affording some weight to the physical RFC form completed by Dr. Lewis; (6) by failing to address the side effects of the medication Gabapentin; and (7) by relying on VE testimony that was inconsistent with information contained in the Dictionary of Occupational Titles (DOT) in violation of Social Security Ruling 00-4p.  (Docs. 10 and 18).

1.  **The Observations of the Cleveland Cooperative Disability Investigations Unit Detectives (Error 1)**

Plaintiff alleges the ALJ erred by relying on the observations of the Cleveland Cooperative Disability Investigations Unit (CDIU) detectives because there was no

14

documentation about their training or expertise in assessing the physical or mental limitations of the individuals they investigate or the vocational implication thereof.   Plaintiff argues the detectives' conclusions about plaintiff's physical ability to maneuver her dog during their interview is speculative and vague, and there is no support for their conclusion that plaintiff "did not appear to have any type of mental or physical disability that would impede her from being able to interact with other people daily."   (Doc. 10, citing Tr. 448).

As an initial matter, the Court notes that plaintiff did not object to the admission of this evidence into the record.   (Tr. 43).   This Court has previously found that the failure to object to the admission of a CDIU report waives any subsequent challenge to the ALJ's reliance thereon. *See Logan v. Comm'r of Soc. Sec.*, No. 3:16-cv-480, 2018 WL 300175, at *3 n.5 (S.D. Ohio Jan. 5, 2018) (Report and Recommendation) (citing *Robinson v. Colvin*, Case No. 1:13-cv-2536, 2015 WL 1400585, at *1, at *3-4 (N.D. Ohio Mar. 26, 2015)), *adopted sub nom. Logan v. Berryhill*, 2018 WL 993852 (S.D. Ohio Feb. 20, 2018).   Therefore, plaintiff has waived this argument.

Even if plaintiff had not waived this assignment of error, the ALJ reasonably considered the observations set forth in the CDIU report as a factor in assessing the credibility of plaintiff's alleged limitations.   (Tr. 22).   The CDIU investigation was initiated after an allegation of fraud had been made subsequent to the 2012 finding that plaintiff was disabled as a result of complex regional pain syndrome.   The ALJ noted the medical evidence of record showed that plaintiff had a normal gait and station each time she had been examined in 2013, and she was taking no medications for complex regional pain syndrome, although she had been using pain medication when her disability claim was granted by the previous ALJ in 2012.   (Tr. 22).   Contrary to plaintiff's contention, there is no indication that the ALJ relied on the investigators' statements

15

concerning plaintiff's lack of observed "mental or physical disability."  (*Id.*).   Rather, the ALJ's

decision states, "When the investigators met the claimant, she attempted to drag her large dog to

another section of the home, and appeared to have no discomfort as she applied direct force to

her right and left legs while trying to pull the dog.   She placed her full weight on one leg while

leaning towards the weight-bearing leg and straightening her opposite leg, with an inward lean at

the ankle."  (Tr. 22).   The ALJ appropriately considered these observations, which stand in

contrast to plaintiff's limited physical abilities and need for a cane for ambulation when she was

found disabled in 2012.   (Tr. 93).   The ALJ reasonably considered the observations of the

CDIU report in conjunction with all of the medical and other evidence of record, and there is no

indication the ALJ placed undue weight on the observations of the CDIU investigators.   *See* 20

C.F.R. § 416.929(c)(3) ("We will consider all of the evidence presented, including . . .

observations by our employees and other persons.").   Plaintiff's first assignment of error should

be overruled.

> ### 2.  Weight to Opinion of State Agency Psychologist Dr. Voyten and Consideration of Psychiatric Review Technique Form of Dr. Seleshi (Errors 2 and 4)

Plaintiff contends the ALJ erred by giving "some weight" to the opinion of Dr. Karla

Voyten, Ph.D., who opined that plaintiff was limited to performing simple, routine tasks in a

predictable setting where changes are infrequent and easily explained.   (Doc. 10 at 3; Doc. 18 at

1, citing Tr. 867-884).   Plaintiff also alleges the ALJ erred by relying on the limitations noted in

Dr. Voyten's Psychiatric Review Technique (PRT) and mental RFC forms.   Plaintiff alleges the

ALJ should have afforded no weight to Dr. Voyten's opinion because she never examined

plaintiff and did not review the Solutions or HealthSource of Ohio records, which were

submitted subsequent to Dr. Voyten's opinion.

When warranted, the opinions of agency medical and psychological consultants "may be entitled to greater weight than the opinions of treating or examining sources." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 379-80 (6th Cir. 2013) (citing SSR 96-6p, 1996 WL 374180, at *3). *See also Wisecup v. Astrue*, No. 3:10-cv-325, 2011 WL 3353870, at *7 (S.D. Ohio July 15, 2011) (Report and Recommendation), *adopted*, 2011 WL 3360042 (S.D. Ohio Aug. 3, 2011) ("opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight"). The opinions of reviewing sources "can be given weight only insofar as they are supported by evidence in the case record." *Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1002 (6th Cir. 2011) (citing SSR 96-6p, 1996 WL 374180, at *2 (1996)). However, "[t]here is no categorical requirement that the non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record" in order for the opinion of the non-treating source to be entitled to greater weight than the opinion of a treating source. *Id*. The Sixth Circuit has explained:

> There will always be a gap between the time the agency experts review the record . . . and the time the hearing decision is issued. Absent a clear showing that the new evidence renders the prior opinion untenable, the mere fact that a gap exists does not warrant the expense and delay of a judicial remand.

*Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 831 (6th Cir. 2009). Before an ALJ accords significant weight to the opinion of a non-examining source who has not reviewed the entire record, the ALJ must give "'some indication' that he 'at least considered' that the source did not review the entire record. . . . In other words, the record must give some indication that the ALJ subjected such an opinion to scrutiny." *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 632 (6th Cir. 2016) (construing *Blakley v. Comm'r Of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009)).

Before the ALJ weighed the medical opinions of record, she thoroughly reviewed the medical evidence both pre- and post-dating the opinion of Dr. Voyten. (Tr. 17-26). The ALJ considered the findings of Dr. Groneck, who performed a consultative psychological exam of plaintiff on January 2015 (Tr. 23-24); plaintiff's numerous hospital visits related to her substance abuse issues (Tr. 24-25); her treatment at Solutions (Tr. 24-25); and her treatment records from HealthSource of Ohio (Tr. 25).

In rendering the mental RFC finding, the ALJ considered the July 17, 2015 mental RFC assessment of Dr. Voyten, whose opinion the ALJ gave "some weight." (Tr. 26, citing Tr. 867-884). Dr. Voyten opined that plaintiff was limited to performing simple, routine tasks in a predictable setting where changes are infrequent and easily explained; she was capable of superficial workplace social interactions; and she has no more than moderate limitations. (Tr. 877, 884). The ALJ generally accepted these limitations but added additional limitations "due to the updated evidence" and assigned "somewhat different functional limitations." These included limiting plaintiff to jobs where changes occur no more than approximately 10% of the workday "to better quantify the extent of her limitations"; limiting plaintiff to interacting with the public no more than 10% of the workday, with no transactional interactions such as sales or negotiations; and limiting plaintiff to occasionally interacting with coworkers and supervisors. (Tr. 26).

The ALJ considered the evidence submitted after Dr. Voyten rendered her opinion and assessed that opinion in light of the subsequent evidence. The ALJ explained why she believed additional restrictions were warranted (Tr. 26) and fulfilled her duty to give "some indication that [s]he at least considered that the [non-examining] source did not review the entire record" and "subjected such an opinion to scrutiny." *Kepke*, 636 F. App'x at 632. The ALJ noted that

Dr. Voyten's opinion was generally supported by the record but acknowledged that the other record evidence showed plaintiff was further limited in her mental functional ability.  (Doc. 26). As a result, the ALJ imposed greater restrictions on plaintiff's mental RFC than those imposed by Dr. Voyten.

Plaintiff has not shown that she suffers from additional mental restrictions that are supported by the evidence of record which the ALJ credited but erroneously omitted from the RFC.  No treating or examining mental health provider of record issued greater limitations on plaintiff's mental functional capacity.   Nor has plaintiff pointed to specific findings from the Solutions or HealthSource of Ohio records that show her mental impairments impose greater limitations in any area of functioning than those assessed by the ALJ.   Plaintiff has not cited any evidence that calls the ALJ's finding into question.   Thus, the ALJ's assessments of Dr. Voyten's opinion and plaintiff's mental limitations are substantially supported by the evidence.

Plaintiff also asserts the ALJ erred by failing to address or discuss Dr. Seleshi's PRT form.  (Doc. 10 at 3, citing Tr. 485-498).   Plaintiff contends Dr. Seleshi gave "great weight" to Dr. Groneck's January 2015 opinion that plaintiff would likely have problems concentrating when she experienced panic attacks, may have difficulty adjusting to major and unexpected changes, and was capable of adjusting to most minor changes in a work routine.   Plaintiff states Dr. Seleshi's opinion was completely ignored by the ALJ.   (Doc. 18 at 3).

The ALJ's decision states:

As for the opinion evidence, some weight is given to the assessment of the state agency mental reviewers, who limited the claimant to performing simple, routine tasks in a predictable setting where changes are infrequent and easily explained (Exhibits B8F, B20F, and B21F).

(Tr. 26).   Plaintiff is correct that the ALJ's decision does not mention Dr. Seleshi by name or specifically reference the PRT form, which was Exhibit B9F of the record.   (Tr. 485-498). However, as the Commissioner points out, a reasonable reading of the ALJ's decision discussing the opinions of "the state agency mental review*ers*" (Tr. 26) (emphasis added) indicates the ALJ's citation to Exhibit "B8F" (a physical RFC form) instead of Exhibit "B9F" (Dr. Seleshi's PRT on initial consideration) is most likely a typographical error.   In any event, plaintiff has failed to show *how* the ALJ committed reversible error by not expressly acknowledging Dr. Seleshi's specific statement.   "An ALJ need not discuss every piece of evidence in the record for h[er] decision to stand."   *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004). *See also Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) (ALJ not required to discuss all evidence submitted and failure to cite specific evidence does not indicate it was not considered).   Nor was the ALJ required to defer to Dr. Seleshi's opinion giving Dr. Groneck's opinion great weight, especially in view of the ALJ's evaluation of Dr. Groneck's opinion as discussed below and the additional evidence submitted in the record after both Dr. Seleshi and Dr. Groneck rendered their opinions.   The ALJ reasonable considered all of the record evidence in evaluating plaintiff's mental RFC, and the Court finds the ALJ did not commit reversible error by not explicitly addressing Dr. Seleshi's PRT form.

### 3.  Weight to Dr. Groneck's Opinion (Error 3)

Plaintiff contends the ALJ erred by affording only "some weight" to the opinion of the consultative psychologist, Dr. Groneck, who actually examined plaintiff, listened to her complaints, and assessed her impairments and limitations.   Plaintiff asserts that Dr. Groneck's observations are consistent with plaintiff's hearing testimony and the records from Solutions.

(Doc. 10 at 3-4, citing Tr. 1510-1564).   Plaintiff contends the ALJ should have given "great weight" to Dr. Groneck's opinion.

Dr. Groneck opined that plaintiff was not expected to have limitations in understanding, remembering, and carrying out instructions; she would "likely" have problems concentrating when she was experiencing pain attacks and "may" require breaks to manage her symptoms; she "may" have some difficulty adjusting to major and unexpected changes in working conditions; she appeared capable of adjusting to most minor changes in a work routine; and she "may" appear vigilant around male coworkers.   (Tr. 474).

In assessing Dr. Groneck's opinion, the ALJ stated:

> [Dr. Groneck's] assessment does not provide useful function-by-function limitations and her use of terms such as "likely" and "may" without any quantified limitations as to the claimant's mental abilities and limitations is of limited use in assessing the claimant's overall functioning.  In addition, she saw the claimant only one time, and not in a treating context. Nevertheless, her assessment and findings do not suggest any marked limitations and generally supports the findings of moderate limitations in this decision as detailed above.

(Tr. 27).

The opinion of a non-treating but examining source is entitled to less weight than the opinion of a treating source, but is generally entitled to more weight than the opinion of a source who has not examined the claimant.   *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010).   *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007).   When deciding the weight to give a non-treating source's opinion, the ALJ should consider the medical specialty of the source, how well-supported by evidence the opinion is, how consistent the opinion is with the record as a whole, and other factors which tend to support or contradict the opinion.   20 C.F.R. § 416.927(c).[3]   Because a non-examining source has no examining or

---

[3] Former § 416.927 was in effect until March 27, 2017, and therefore applies to plaintiff's January 2015 cessation

treating relationship with the claimant, the weight given to the opinion of a non-examining source depends on the degree to which the source provides supporting explanations for the opinion and the degree to which the opinion considers all of the pertinent evidence in the record, including the opinions of treating and other examining sources.   *Id*.

The ALJ observed that Dr. Groneck engaged in a single consultative evaluation of plaintiff.   The "[l]ength of the treatment relationship and the frequency of examination" are recognized metrics for weighing medical opinions.   In addition, the ALJ gave valid reasons for discounting Dr. Groneck's opinion.   The ALJ found that Dr. Groneck's opinion was entitled to only "some" weight based on the infrequency of examination and the vague nature of her conclusions.   (Tr. 27).   The ALJ reasonably determined that Dr. Groneck's failure to quantify plaintiff's alleged limitations was of limited use in assessing plaintiff's functional capacity.

Plaintiff alleges that the ALJ should have afforded great weight to Dr. Groneck's opinion as Dr. Groneck had the opportunity to examine plaintiff and personally assess her impairments and limitations.   Plaintiff suggests that the ALJ should have given greater weight to the opinion of the consultative examiner than to the state agency psychologist, Dr. Voyten, whose opinions were both afforded "some" weight by the ALJ.   However, the ALJ was not bound to adopt Dr. Groneck's assessment over that of the state agency psychological consultant simply because she had examined plaintiff once.   *See Harrold v. Colvin*, 1:14-CV-83, 2015 WL 5022086, at *7 (E.D. Tenn. Aug. 24, 2015) (citing SSR 96-6p, 1996 WL 374180 (1996) ("in appropriate circumstances, 'opinions from State agency medical and psychological consultants . . . may be entitled to greater weight than the opinions of treating or examining sources,'" such as when the "reviewing source has broader access to the claimant's

decision.

22

records.").

Finally, plaintiff contends that Dr. Groneck's observations were consistent with the medical records from Solutions Community Counseling and Recovery Centers.   (Doc. 10 at 3-4).   However, plaintiff has failed to direct the Court's attention to specific findings or medical assessments within those records, and she has made no attempt to explain how Dr. Groneck's opinion is supported by those records.   Moreover, the ALJ reasonably determined that Dr. Groneck's assessment and findings did not suggest any marked limitations and generally supported the findings of moderate limitations.   The ALJ noted that plaintiff successfully completed online college courses, and despite her combined impairments and substance abuse issues, the record evidence showed no more than moderate limitations aside from some acute periods of exacerbation.   (Tr. 27-28, citing Tr. 837-41, 1017, 1191-1192, 1644, 1634).   The Court concludes the ALJ did not err by giving "some" weight to Dr. Groneck's opinion.   Plaintiff's third assignment of error should be overruled.

### 4.   Weight to Dr. Elaine Lewis's Opinion (Error 5)

Plaintiff alleges the ALJ erred when she afforded "some weight" to the opinion of state agency physician Dr. Lewis.   (Doc. 10 at 4).   Plaintiff states that Dr. Lewis did not review any of the medical evidence submitted after she completed her medical review and RFC form, including records from Clinton Memorial Hospital, HealthSource of Ohio, Dr. Daniel Debo, Dr. Joseph Chen, the Ohio State University Wexner Medical Center, and the Christ Hospital. (*Id*.).

Plaintiff has failed to explain how these additional records that were submitted subsequent to Dr. Lewis's assessment support greater restrictions than those found by the ALJ.

23

Nor has plaintiff explained how the ALJ erred in weighing Dr. Lewis's opinion based on such records.

In July 2015, Dr. Lewis reviewed the record and completed a physical RFC form. (Tr. 857-64). Dr. Lewis opined that plaintiff was limited to light work, except she could occasionally climb ramps and stairs, ladders, ropes, and scaffolds; could occasionally crouch, and crawl; and should avoid even moderate exposure to unprotected heights, hazards, and commercial driving. (*Id*.).

The ALJ determined Dr. Lewis's opinion was entitled to "some" weight. The ALJ agreed with Dr. Lewis's limitation to light work, but she added additional restrictions to plaintiff's RFC "to better quantify [plaintiff's] limitations" based, in part, on evidence submitted subsequent to Dr. Lewis's opinion. (Tr. 26-27). Specifically, the ALJ precluded plaintiff from operating foot controls with the right lower extremity and limited her to only occasional operation of foot controls with the left lower extremity due to her complex regional pain syndrome and the mild degenerative changes in her feet. (Tr. 26, citing Tr. 433-40, 1599-1600). The ALJ also precluded plaintiff from climbing ladders, ropes, or scaffolds due to her pain syndrome and degenerative changes. The ALJ also limited plaintiff to only occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling for the same reason. (Tr. 26). Consistent with Dr. Lewis's opinion, the ALJ further precluded plaintiff from all exposure to extreme cold and heat due to her complex regional pain syndrome, and she precluded all use of dangerous machinery, all exposure to unprotected heights, and all commercial driving. (Tr. 26).

The ALJ's findings in this regard are supported by substantial evidence. In giving

24

"some weight" to Dr. Lewis's RFC assessment, the ALJ cited to records that reflected normal clinical findings, including normal gait, sensation, range of motion, and deep tendon reflexes, and no neurological defects.   (Tr. 26-27, citing Tr. 959, 973, 982, 1098, 1430, 1582).   The ALJ acknowledged that plaintiff experienced flares of foot pain, was diagnosed with plantar fasciitis, and x-rays of her feet showed minimal degenerative changes bilaterally.   (Tr. 27, citing Tr. 1042-1045, 1357-1359, 1599).   The ALJ added the limitations described above to account for plaintiff's foot impairments.   The ALJ thoroughly reviewed the medical evidence related to plaintiff's physical impairments and reasonably concluded that plaintiff was limited to light work activity, as opined by Dr. Lewis, with additional restrictions to accommodate her foot and pain impairments.   The Court finds no error in the ALJ's weighing of Dr. Lewis's opinion.   Plaintiff's fifth assignment of error should be overruled.

### 5.   The Side Effects of Gabapentin (Error 6)

Plaintiff contends the ALJ erred when she failed to address the side effects of the medication Gabapentin on plaintiff's ability to work.   Plaintiff states that "the ALJ failed to consider the fact that Gabapentin causes drowsiness and the impact that drowsiness side-effects could have on Plaintiff's ability to work."   (Doc. 10 at 4-5, citing Tr. 1565-1624). In her reply memorandum, plaintiff alleges that Dr. Kudalkar, a rheumatologist, "noted that the Gabapentin that he prescribed Plaintiff caused drowsiness."   (Doc. 18, citing Tr. 1578, 1573, 1583).

Plaintiff was first seen by Dr. Kudalkar on May 3, 2017 for an evaluation of joint pain. (Tr. 1584).   On May 24, 2017, Dr. Kudalkar's progress notes state that a potential side effect of Gabapentin is drowsiness, but it depends on the dose: "May consider gaba or lyrica instead.

25

Rx for gaba 100-300 mg qhs was given today.   S/e-drowsiness etc, usually dose dependent."
(Tr. 1583).   At plaintiff's two subsequent visits with Dr. Kudalkar, plaintiff reported that "she
is now able to tolerate taking gabapentin 300 mg at night although she felt drowsy *when she
first took it*."   (Tr. 1577-78, Aug. 23, 2017; Tr. 1572, Dec. 6, 2017) (emphasis added).
Plaintiff has failed to point to any evidence that the side effects of Gabapentin made her so
drowsy that she could not work.   While plaintiff reported she initially felt drowsy when she
first started the medication, she subsequently reported she was able to tolerate it.   This brief
period of sedation from Gabapentin, without more, does not provide a basis for disturbing the
ALJ's finding that plaintiff was no longer disabled.   *See Hamper v. Comm'r of Soc. Sec.*, 714
F. Supp. 2d 693, 707 (E.D. Mich. 2010) (and cases cited therein).

### 6.   Reliance on VE Testimony (Error 7)

Plaintiff alleges the ALJ erred by relying on VE testimony that was inconsistent with
information contained in the DOT in violation of Social Security Ruling 00-4p.   Plaintiff
contends the RFC assigned by the ALJ limited plaintiff to reasoning level "1" jobs, whereas
the jobs identified by the VE in response to the ALJ's hypothetical question, with the
exception of one job, require a reasoning level of "2."   (Doc. 10 at 5-7).

The hypothetical questions the ALJ presented to the VE reflected an individual who was
able to perform unskilled, light work or sedentary work and was "limited to simple routine tasks"
and "limited to jobs in which changes occur no more than approximately 10 percent of the
workday," as well as certain physical limitations.   (Tr. 77).   The VE testified that this individual
could perform light work jobs such as laundry article sorter (DOT #361.687-014) and machine
feeder (DOT #819.686-010) and sedentary work jobs such as table worker (DOT #739.687-182),

eyeglass frame polisher (DOT #713.684-038), and laminator I (DOT #690.685-258).   (Tr.

78-79).

      The DOT occupations listed by the VE are coded as reasoning level 2 jobs, with the

exception of the table worker job, which requires a reasoning level of 1.[4]   Reasoning level 2

jobs require an individual to "[a]pply commonsense understanding to carry out detailed but

uninvolved written or oral instructions" and "[d]eal with problems involving a few concrete

variables in or from standardized situations."   Dictionary of Occupational Titles, Appendix C,

4th Ed., rev. 1991 (available at http://www.occupationalinfo.org/appendxc_1.html) (last visited

June 18, 2020).   Plaintiff's RFC limits her to reasoning level 1 work, which involves the

application of "commonsense understanding to carry out simple one- or two-step instructions"

and to "[d]eal with standardized situations with occasional or no variables in or from these

situations encountered on the job."   *Id.*   Plaintiff argues that the VE's testimony conflicts with

the DOT and demonstrates that the ALJ's decision at step five of the sequential evaluation

process is not supported by substantial evidence.   The Court disagrees.

      First, plaintiff has failed to cite any legal authority specifying that jobs requiring a

reasoning level of 2 are inconsistent with simple routine work.   The Sixth Circuit has rejected

"the proposition that [DOT] jobs requiring reasoning levels two or three are inconsistent as a

matter of law with a limitation to simple work."   *Monateri v. Comm'r of Soc. Sec.*, 436 F. App'x

434, 446 (6th Cir. 2011).   Moreover, Social Security Ruling 00-4p recognizes that a VE "may

be able to provide more specific information about jobs or occupations than the DOT."   SSR

00-4p.   Thus, the ALJ could reasonably rely on the VE's testimony that plaintiff could perform

---

[4] *See* Dictionary of Occupational Titles at http://www.occupationalinfo.org/contents.html (last visited on June 18, 2020).

the light and sedentary, unskilled jobs identified by the VE to satisfy her burden at step five of the sequential evaluation process despite the DOT's listing of reasoning level 2 for such jobs.

Second, even if the Court were to find an apparent conflict between the VE's testimony and the DOT based on the reasoning levels cited in the DOT, the ALJ met his burden of inquiry under SSR 00-4p. The ALJ has a duty under Social Security Ruling 00-4p to develop the record and ensure there is consistency between the VE's testimony and the DOT and "inquire on the record, as to whether or not there is such consistency." SSR 00-4p. Where the ALJ questions the VE and the VE testifies that there is no conflict with the DOT, the Sixth Circuit has held that the ALJ is under no further obligation to interrogate the VE, especially where the plaintiff is afforded a full opportunity to cross-examine the VE. *See Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 606 (6th Cir. 2009). The ALJ is only required to develop the record further where the conflict between the DOT and the VE's testimony is apparent. *Id.*; *see also* SSR 00-4p ("*If* the VE's . . . evidence appears to conflict with the DOT, the adjudicator will obtain a reasonable explanation for the apparent conflict.") (emphasis added).

In this case, the ALJ asked the VE to advise if any of her testimony "diverges from the DOT and if so how." (Tr. 77). The VE complied and clarified that her testimony was based on her professional experience and not the DOT. (Tr. 82-83). When the questioning was turned over to plaintiff's counsel, he did not question the VE about any apparent inconsistencies between her testimony and the DOT, nor did counsel bring any potential conflicts to the ALJ's attention after the hearing. Counsel was afforded a full opportunity to cross-examine the vocational expert and the ALJ had no affirmative duty under SSR 00-4p to conduct her own interrogation of the VE to determine the accuracy of the vocational testimony. *See Lindsley*, 560 F.3d at 606 (citing *Martin v. Commissioner of Social Security*, 170 F. App'x 369, 374 (6th

28

Cir. 2006) ("Nothing in S.S.R. 00-4p places an affirmative duty on the ALJ to conduct an independent investigation into the testimony of witnesses to determine if they are correct.")). The ALJ committed no error under SSR 00-4p.

Finally, any error on the part of the ALJ on the jobs requiring a reasoning level of 2 that were identified by the VE would be harmless. The VE testified that a person with plaintiff's physical and mental abilities would be able to perform the sedentary job of table worker, which has a reasoning level of 1. The VE testified there were approximately 161,000 such jobs in the national economy (Tr. 79), and plaintiff has not challenged as insufficient this number of jobs under Step 5. *See Taskila v. Comm'r of Soc. Sec.*, 819 F.3d 902, 905 (6th Cir. 2016) (200 jobs in the region and 6,000 jobs nationwide amounted to "significant numbers" of available jobs) (citing *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 579 (6th Cir. 2009) (2,000 jobs in the national economy constituted a significant number)). *See also Nash v. Sec'y of H.H.S.*, 59 F.3d 171 (Table), 1995 WL 363381, at *3 (6th Cir. June 15, 1995) (70,000 jobs in the national economy was a significant number); *Putman v. Astrue*, No. 4:07-cv-63, 2009 WL 838155, at *2-3 (E.D. Tenn. Mar. 30, 2009) (200-250 regional jobs and 75,000 national jobs constituted significant numbers) (citing cases). Thus, because the evidence establishes that plaintiff could perform a significant number of jobs if restricted to sedentary work requiring a reasoning level of 1, any error the ALJ committed by considering jobs with a reasoning level of 2 was harmless.

The ALJ's reliance on the VE testimony to find plaintiff not disabled is supported by substantial vocational evidence and should be affirmed. Accordingly, plaintiff's seventh assignment of error should be overruled.

### IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **AFFIRMED** and this matter be closed on the

docket of the Court.

Date: _June 23, 2020_____

Karen L. Litkovitz
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

JENNIFER RENEE VALLEE     Case No. 1:19-cv-114
   Plaintiff,        Cole, J.
               Litkovitz, M.J.

   vs.


COMMISSIONER OF
SOCIAL SECURITY,
   Defendant.


### NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO R&R

   Pursuant to Fed. R. Civ. P. 72(b), **WITHIN 14 DAYS** after being served with a copy of

the recommended disposition, a party may serve and file specific written objections to the

proposed findings and recommendations. This period may be extended further by the Court on

timely motion for an extension. Such objections shall specify the portions of the Report

objected to and shall be accompanied by a memorandum of law in support of the objections. If

the Report and Recommendation is based in whole or in part upon matters occurring on the

record at an oral hearing, the objecting party shall promptly arrange for the transcription of the

record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems

sufficient, unless the assigned District Judge otherwise directs. A party may respond to another

party's objections **WITHIN 14 DAYS** after being served with a copy thereof. Failure to make

objections in accordance with this procedure may forfeit rights on appeal. *See Thomas* v. *Arn,*

474 U.S. 140 (1985); *United States* v. *Walters,* 638 F.2d 947 (6th Cir. 1981).